Next case, Ivan Antonyuk v. Corey Johnson et al. v. Stephen Negrelli v. Joseph Cecil For the last time today, may it please the court, Esther Merdukaeva for the State Defendants. Under the terms of the District Court's injunction, the State would have to grant firearms licenses to persons whether or not they were able to use a weapon safely. And those persons would in turn be able to carry their firearms into places like Lincoln Center, the Central Park Zoo, downtown restaurants, or even private homes, all without notifying, much less obtaining consent from property owners. Bruin does not envision, much less mandate, this result. The injunction should be reversed for several reasons. I'll begin with the licensing provisions, which we actually have not spoken about yet. The plaintiffs' lack standing to challenge the licensing provisions. Five of the six plaintiffs already have licenses, so these I've never applied for a license, but he says that he objects to and he wants to challenge the information gathering or information requirements of the licensing law, right? Do you disagree that he lacks standing to challenge those informational provisions? I do disagree for several reasons, Your Honor. The first is that in Libertarian Party of Erie County, the situation was the same. The plaintiff there was challenging the notion of licensing. The argument there was that a government could not condition the Second Amendment right on licensing. And the court there concluded that not applying for a license was still enough to mean that that plaintiff lacks standing, even though the plaintiff was objecting to kind of a concept of licensing altogether. Well, he's not objecting to the concept of some of the specific requirements of New York's licensing law, and the barrier to entry, as it were, is that he says you shouldn't be constitutionally permitted to ask me certain questions. Now, putting aside the merits of that, isn't that something that he wants to apply for a license, I take it, so long as he doesn't have to go through some of those procedures? So, and just to be clear, he challenges both those procedures and the substance of good moral character requirement. Yeah, but isn't it, well, then the next question is going to be, if he has standing to challenge those informational provisions, isn't the only reason that you have for having those is the good moral character provision? I mean, isn't that what they're in support of? That is what those disclosure requirements are in support of, but it does not mean that having standing to challenge those disclosure requirements would mean that you have standing to challenge the good moral character requirement. Well, I'm just puzzled then, because if he has standing to challenge the, you want to know what his social media accounts are. I guess he has some. I'd be in a fortunate position of not having to deal with that. But if, he says you can't ask me that, that's an intrusion on my privacy or whatever, yada, yada, or that's a violation of the Second Amendment itself because it's a deterrent to my, whatever his merits arguments are. But your response is going to be, I take it, that the reason we ask these things and the reason we're entitled to ask these things is because that's part of enforcing the good moral character requirement. And you're saying, okay, so he can challenge those provisions and then he loses because we just have to say we have a good moral character requirement. He can't come back and say, but you're not allowed to have that either. Well, he, I guess just to be clear, the reason for Article III standing is to ensure that courts are not adjudicating hypothetical disputes. We have no way of knowing whether his application would be rejected because he lacked good moral character. In fact, if you take his allegations... Wouldn't it be rejected if he came in and said I refuse to answer those questions? But that rejection would be on the basis of submitting an incomplete application, not on the basis of failing to meet the good moral character requirement, which has substantive elements. We have no way of knowing how a licensing officer would interpret those substantive elements to apply to his application because he never submitted one. That is the exact same situation that was at issue in Libertarian Party. That's the exact same situation that was at issue in DeCastro. But even if there was standing to challenge these requirements, the challenge would all fail. All of the challenges would fail at the textual part of the test. These provisions are all intended to ensure that only law-abiding and responsible people obtain firearms licenses. Those are the people that are protected by the text of the Second Amendment. Conversely, people who fall outside the category of law-abiding and responsible people do not have Second Amendment rights. Here, these requirements are tied to the assessment of being law-abiding and responsible. The good moral character requirement ensures that a person be entrusted, safely entrusted to use a weapon, only in a manner... I just want to ask you, the law-abiding aspect, I mean, to me, suggests concerns about criminal background, criminal behavior, that type of thing. Social media postings, how is that appropriate circumstance to look at to determine law-abiding? And I guess, perhaps you'd say it goes to good moral character, but that's, you know, I have no idea what the licensing official would be looking for beyond a post, perhaps, related to criminal activity. Well, the definition of good moral character in the statute references having the character, temperament, and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others. And the review of social media is intended to confirm that the applicant is able to be entrusted with a weapon and to not use it to hurt himself or others. So if there were suicidal ideation expressed in posts on social media, and I take it, I mean, I'm a little unclear about this, and maybe you can help me with it, it's a preliminary question. He's just supposed to give his accounts, right? A list of the accounts. To identify the accounts, yes. I assume that means that somebody's going to look at those accounts, but I also assume that at least on the first bounce, at least until we get to what I suspect would have to be the basis of some kind of as-applied challenge, some request for further information, if you look at what is publicly available to any Facebook user or any Twitter user on the account listed in this name that he has given us as the name of the account, that in the first instance, the only thing you're going to be able to look at is what is available to any users, right? Correct, Your Honor. That is a fundamental misunderstanding of the law in the plaintiff's argument. The law does not require that you friend a licensing official so that they can see otherwise restricted information. And the licensing official has some discretion to ask for more, but it's a little hard for me to see how that could be the basis of a facial challenge until we know something about what has been asked of a particular person or what the record is generally about what they ask about people, and we haven't gotten to that kind of thing yet. But let me just, so let me just get back to that. Is something like suicidal ideation the kind of thing that you would be looking for? Because I'm just trying to figure out, you have this standard, and then you've got this whole list of things that are interesting, examples of things that, categories of people who might not meet the good character requirement, right, who are not allowed to have licenses, and I'm trying to look for who else is there who is not safe to have a weapon, who has not fallen into any of those categories, and that was the first thing that occurred to me. Is that the kind of thing you're talking about? It could be, Your Honor, in part because there is documented evidence that people who use firearms to commit suicide often also use it to hurt others. All the time, including police officers. The state is, also separately, has an interest in preventing suicide, that that is the harm posed by the use of firearm to oneself is a legitimate state interest that warrants the application of this requirement. But I think Your Honor's questions more generally go to the problem of bringing this as a facial challenge, because as the district court acknowledged, there are innumerable constitutional applications of the good moral character requirement. This court actually identified many of them in Libertarian Party. There are also innumerable constitutional applications of the various disclosure requirements. There may be as-applied challenges that come in the future, but the hypothetical possibility of as-applied challenges is not a basis to enjoin these provisions on their face. I see that I'm over time. I would like to briefly address sensitive places, as there are more at issue here, if that's all right, Your Honor. There's a lot of them, and I don't know which ones they're going to emphasize in their oral arguments, but there are a whole bunch of them you've got to deal with. There are many of them, Your Honor, and I guess, again, I would emphasize that there are, I guess, two alternative paths to looking at sensitive place restrictions. One would be to find historical twins. That's not required, but there are cases where you will find those historical twins, like the places of worship, or like public parks, or like places for social, educational, or literary gatherings. Public parks first, because one of the things that I found most odd about this, public parks includes Adirondack Park? It does not, Your Honor. Why not? Is there a definition of parks that I've missed? Well, the New York State Department of Criminal Justice Services has put out guidance on the scope of the law, and has specified in that guidance that Adirondacks and Catskill State Parks are not public parks themselves. They may have buildings that are separately sensitive locations, but the- And what about Allegheny Park and Harriman State Park? Between the two of them, that's about 100,000 acres. Are they included? I'm not sure of the answer to that, Your Honor. I will also note that this is also the subject of some legislative proposals that are being discussed as part of the budget process. Because some of these places, some things that look to me like public parks, and I didn't see any definition that excludes any of the places that I've mentioned, those are places that have maybe not lions and tigers, but certainly bears. They, you know, I've seen deliverance. I feel much safer in the streets of Manhattan than in some of these places, because that's where I come from and I'm used to it. So it seems to me that going out in the wilderness armed is some attraction to that. If I ever went in the wilderness, I might reconsider my not having weapons. So really you're talking about all those vast expanses of areas are gun-free zones? Because they're sensitive places? Your Honor, there may be room for an as-applied challenge to the designation or inclusion of a particular park as sensitive. But what the plaintiffs are seeking here is an injunction against enforcement of this provision in every public park, including places like Prospect Park or Central Park Why couldn't we conclude that the intended and reasonable scope is city parks, parks in urban areas? Well, there's nothing in the statute that would infer that as a matter of legislative intent. I suppose if what Your Honor is asking is whether you could interpret that- That the legislature may properly restrict guns in places that they can't. You could decide this as a question of legislative intent. I'm not aware of anything on the face of the law that would allow for that conclusion. But there is the guidance from DCJS, which I guess the court could use to inform its conclusion. If there's historical support at appropriate times for the regulation of the Second Amendment in urban parks, but not elsewhere, then part of the statute could be constitutional, theoretically, and part unconstitutional. So if Your Honor is asking if you could interpret the historical record to be limited to city parks- That's what I'm asking, yeah. That is one conclusion that you could reach. I don't think that the historical statutes are exclusively limited to city parks, but many of them do arise in the context of city parks, because that is where public parks arose as an institution in the 19th century. And part of the district court's error was in categorically just rejecting all of those prohibitions because they came from cities. And as I mentioned a few hours ago at this point, the regulation of firearms by cities was some of the most central and pervasive firearms regulation in the nation's history. Separately, the court misapplied principles of analogical reasoning and principles of relevant similarity in many different ways here. One that we have not yet spoken about is the court's imposition of a population-related metric. Announcing at the preliminary injunction stage that it would discount certain laws from certain states or jurisdictions that it deemed were too small. There are many problems with that conclusion. The first is that there is no basis to find that laws have less of a place in the historical tradition of this country because they come from small states. Small states have equal sovereignty to other states, and their laws should be considered as well. Second, there is nothing in Bruin that allows for this kind of population-driven conclusion. What the court cited to and the plaintiffs cite to is Bruin's discussion of the territorial laws. But the territorial laws were discounted in Bruin as analogs for the proper cause requirement. And the conclusion there was in light of the overwhelming evidence that the Supreme Court identified on the other side supporting a tradition of public carry, laws from territories could not be enough to surmount the tradition on the other side. The court did not hold that territorial laws as a matter, as just a holistic matter, could be excluded, nor did the court hold that because the territories were small, all laws from all other jurisdictions that are also small could be excluded. Again, what Bruin was aiming at was ascertaining a standard that would capture an accurate understanding of the historical understanding of the Second Amendment. You cannot reach an accurate understanding of the historical meaning of the Second Amendment by applying these categorical rules that just carve out relevant historical evidence. And that is exactly what the district court did here. Whatever rule your honors announce today as to how you apply Bruin's test should focus on the purpose of the Bruin test, which is to reach an accurate understanding of the meaning of the Second Amendment, not to apply categorical rules, gotcha requirements that artificially circumscribe the historical record. Thank you. Thank you. Good morning, your honors, and may it please the court. My name is Todd Long for Appellant Joseph Cecil, who is the Chief of Police of the Syracuse Police Department. And my argument here today is very narrow. It is not focused specifically on the law itself, but whether Corey Johnson, the appellee and plaintiff in the case, had standing with respect to the preliminary injunction that was brought against Chief Cecil and the fellow appellants. I just want to highlight just a few what we believe are factual errors that resulted in abusive discretion that were made by the district court that resulted in founding of standing against Chief Cecil vis-a-vis Mr. Johnson. The court found particularly two types of locations in which there was standing. One, a variety of retail locations throughout Onondaga County, including by name, gas stations and big box stores, but not identifying any specific stores that Mr. Johnson would be going to with his concealed carry. I would emphasize, though, just when speaking about Chief Cecil, is that his jurisdiction is with respect to the city of Syracuse. And I don't know how familiar people are with the geography, but the city of Syracuse is one of, as I put in our papers, 19 municipalities within the county of Onondaga, centrally located within the county. And so that's important with respect to the notion of those various locations. The other factual issues with respect to those locations relate to the zoo, which is a county park known as the Rosemont Gifford Zoo. So as the court is well aware, it would be Mr. Johnson's burden, by clear showing, to demonstrate that there would be some injury effect that was concrete and particularized and that was actual or imminent. With respect to any fears of arrest or prosecution by Chief Cecil, they can't be imaginary or speculative or even uncertain. As to that first error with respect particularly to the general location of stores, the court drew a conclusion or inferred that Mr. Johnson lived within the jurisdictional boundaries of the city of Syracuse. Nowhere in his declaration or in the complaint does Mr. Johnson indicate that he lives within the jurisdictional boundaries of the city of Syracuse itself. Instead, an inference was made that Mr. Johnson could or does live in the city of Syracuse on the grounds that he quoted a press release or a press statement that was in our local paper regarding the county district attorney and our chief of police, Chief Cecil, and indicates that the district attorney, William Fitzpatrick, and Chief Cecil are the top law enforcement officials where I live. We believe it is a step too far to then infer that he is an actual resident of the city of Syracuse. And why that's important is because Wait, wait, wait. Why are we not reading that, drawing reasonable inferences in favor of the plaintiff? He says these are the guys who enforce the law where I live. Why would he say that if he lived outside of Syracuse or, for that matter, with respect to the district attorney outside the county? Don't we assume that he says they're the people who enforce the law where I live, that he lives where they enforce the law? Isn't that what he's saying? Well, Your Honor, with respect to that, two issues. Number one, it would also be a fair inference when I'm speaking of top law enforcement authority in the area where I live and I'm referring generally to the county. I could also refer to the county sheriff. I could be referring to a lot of things that doesn't necessarily indicate that it's I live within the jurisdictional boundaries of these generally top law enforcement officials within the county. The other issue is that with respect to, I'm getting lost. My second point is there was every opportunity after we opposed the preliminary injunction to provide some sort of evidence or a declaration that he was indeed, in fact, a resident of the city of Syracuse. That was not offered. There was an indication in briefing, which is not itself factual evidence, that that's where he lived within the city of Syracuse. But there's nothing before the court as far as factual evidence. And are we also to assume that if somebody says, you know, I go shopping in lots of places and here's how this is going to affect me, I would think that if someone lived in some place in Nassau County and they said, you know, this is going to affect me when I go shopping, people often cross that border to come shopping in New York City. So if he's suing the NYPD, they're the people who will arrest him enforcing this law, if they're enforcing that law, when he shops in New York City. He has to say, I sometimes go into Syracuse. I mean, it seems very artificial, what you're asking. It seems to be a silly proposition. But the reason why I bring this up is that the court used this in order to bolster what I believe a wholly speculative argument to begin with, that Mr. Johnson was going to go to a specific place where he would conceal carry. Again, all he lists is gas stations. I would venture to guess there are hundreds and hundreds of gas stations within the county. Again, to build this idea that, well, it could potentially be a gas station within the city of Syracuse, I think it was an abuse of discretion for the court to find that, well, Mr. Johnson is a city of Syracuse resident, and therefore it increases the likelihood that he could go to a city of Syracuse gas station as opposed to other municipalities. Does he at the Rosamond Zoo, is that within the city of Syracuse? Is that part of the zoo? So as to the zoo, and if you don't mind, yes, the zoo is within the city of Syracuse. If I may just pivot to the zoo, because I think the zoo is a more salient and important point here. The zoo is within the jurisdictional boundaries of the city of Syracuse. The zoo is actually co-located with the Syracuse City Park, and as was just addressed before, the idea of city parks as opposed to maybe larger state parks, that particular city park, yes, is within the city, but also the county zoo is within the city as well. And that zoo is completely under the jurisdiction of Onondaga County. Not only is it solely under the jurisdiction of Onondaga County, but it actually has its own police force. The county parks, and this is not disputed by the county, who is also a party in this matter. The county of Onondaga has its own park ranger service that provides roving patrols within these particular locations. And so the point of that argument that we had made is it creates a series of further and further causal gaps in speculating as to whether or not a Syracuse police officer would ever be involved in any complaint at, say, the zoo. Does the city of Syracuse Police Department have the jurisdiction to act within the county park? They would have jurisdiction, as I understand it. I still don't understand. I mean, look, in New York City, which I'm more familiar with, I wish I were more familiar with Syracuse, but I'm not. In New York City, we have park police that are a separate police agency. We have state parks right here in Manhattan. But I also see the NYPD around, and I certainly hope that if some crime were committed against me and I yelled help and there was a city police officer standing outside the boundary of the park, he would come and help. In fact, I know he would, or she. A city police officer would do that because they can. It's part of their remit. So, again, I don't understand. Why is it so speculative if this law is going to be enforced that it might not be a Syracuse police officer who enforced it? Well, I guess it creates a moral level of uncertainty. And the standard here and the burden on the plaintiff in seeking a preliminary injunction on these Article III matters, particularly with respect to standing, is one that is just shy, if not at, summary judgment. And so if he would have to make some sort of showing factually that there is no dispute, that under these circumstances it is likely, if not certain, that I would be arrested making certain actions, say concealed carry at the zoo, if he cannot meet that burden, that burden is on him. I would note the John Doe's case, the county of Suffolk, again, where there's a specific articulized threat, so to speak, of prosecution relating to the violation of this particular law, dealing with this firearm, none of those conditions would exist here. So, thank you. There we go. Raise it, okay. I still think it's the morning, so good morning, because I don't have a watch on, but good morning and may it please the court. My name is Stephen Stainblea, my co-counsel Rob Olson, and we represent the appellees. So there's a couple of things that I would just like to kind of start off with. This law, the Concealed Carry Improvement Act, was enacted eight days after the Bruin decision came out. Governor Hopel promised that she was going to fight back, and the New York Assembly and her did just that. They thumbed their nose at the Supreme Court, they retaliated against the Second Amendment, and they're really thumbing their nose at the judiciary in general. How can it be that New Yorkers had more rights prior to Bruin, more Second Amendment rights, than they do after it? It doesn't make any sense. Now, I want to kind of address some of the concerns that my friend Mr. Long had about Plaintiff Johnson. We have the, you know, to all the other places that he says wasn't particularized, he didn't name the gas station, he didn't name the specific big box store he wanted to go to within Syracuse, we have an admission that he wanted to go to the zoo. Now, Mr. Long's client wants Plaintiff Johnson to list exactly when and where and how long he's going to be there, and the Supreme Court doesn't require that for standing. His client made a statement that he was going to, on a complaint-driven basis, take and seize firearms from people that were, you know, prior to the Concealed Carry Act, lawfully carrying within numerous places. So I think that's enough, and the district court certainly found that that was enough, and it was not an abuse of discretion at this early stage for the district court to find that. Maybe something later on happens, but at this point I don't think it was an abuse of discretion. He also mentioned Onondaga County didn't dispute that they owned part of the zoo or the zoo. Onondaga County didn't even oppose the preliminary injunction. In fact, like five of the defendants filed non-opposition motions not opposing the preliminary injunction for various reasons, known only to them, and I think that that's worth pointing out to the court. It was just, you know, a select group of people that were really adamant about this, and despite Chief Cecil, or Chief Cecil, I should say, I'm not from here, I don't speak that way, not having lots of opportunities to say, we're not going to enforce it, we're not going to enforce it. What does he do? He files a reply brief, an opening brief and a reply brief where he talks about how important this law is. Okay, well, I can tell you who it's not. It's not, it might be directed at keeping bad people from carrying guns, but what it's doing is it's keeping everyone from carrying guns, all over, across the state, even though they were permitted, they jumped through all the hoops that New York had, and it's stopping everyone from carrying a gun. No one wants bad people to carry guns. No one wants murderers to carry guns. I'm certainly not going to walk into your house, Judge, with a gun without you specifically inviting me to do it. No one's saying that that should be allowed, and you probably wouldn't, but no one's saying that that should be allowed. But you have the right to, if you had your own medical practice, to tell who could come into your house or your medical practice and who not to. The state took that away from everyone that owns their own business if it's listed as a sensitive place. I'll give you an example. Pastor Mann, plaintiff Mann in this case, is the pastor of a church and lives in a house connected, a parsonage connected to his church. The state, on the auspice of exercising his bundle of rights, right, they took one of his bundle of rights and said, we're not going to let you carry in this parsonage in your home. In the district court, counsel for the defendant said, well, that's an interesting question, whether or not Pastor Mann could have a gun in his home, because we're going to have to wait for an enforcement action. And the reason is that the parsonage is physically connected to the church. It's at a place of worship. He has some kinds of Sunday school meetings and whatnot in his parsonage. The state couldn't answer that. To me, that's a really easy answer. Of course he can carry it in his home. Of course he can possess it in his home. But the state said, we're going to have to wait for enforcement. Well, I think that's wrong, because sometimes maybe he is found not guilty, but kind of the punishment is the process. He's still going to have to go through all that. And I don't think that's the right way to do it. He stated his intent to carry in his church no matter what. It's funny. When the court first granted the temporary stay, and they basically said, we're going to stay all of the district court's opinion. And when we had a chance to reply to that, and we said, well, you're giving them more than they even asked for. And they came out and said, well, we're only going to appeal churches, but we're going to let people designate who can carry in there. And we're going to appeal the buses, but not private buses. So the relief that was provided is not even as – I'm trying to think of the best way to phrase that. I'm sorry. You know, the court went kind of a little bit too far. You're here now on the merits. On the merits. So, you know, I take it that what we think are the merits of the case will determine what is going to be allowed to be enforced and what isn't going to be allowed to be enforced. So a previous panel dealt with the stay. We're here with a stay in place. It might get lifted depending on how this case comes out. You know, the decisions below could be affirmed. They could be reversed. Let's focus on the merits of the case. And that'll get us going. I was going somewhere with that, Judge, and I kind of lost myself for a second. I think it was you, Judge, that asked about some legislation that's coming up that might moot out one of the cases. It might moot out his. It might not moot out yours. You know, you've got – I'm sure you get a little more time, but you've got limited time, and you've got a whole bunch of places that we want to talk about as sensitive places. You've got this licensing requirement of good moral character to talk about. Let's not get too lost in the weeds of procedure. Okay, well, I'll address my friend's over here argument about the analogs in this case. I think Bruin is pretty clear that we have to look back to 1791 and not necessarily to 1868. Can I just ask you just as sort of a big picture question, and I asked another advocate earlier about this, what is your view of the significance of the designation of a place as sensitive and also Bruin's suggestion that there can, in fact, be new sensitive places? How are we to interpret that? Well, Bruin did presumptively announce some amounts of sensitive places, right? And then there said there could be new, which was italicized in analogous sensitive places. So I don't know that something that's been in existence since, like, the 1800s could all of a sudden be some new and analogous place. I think the place would actually have to be, like, a new place, like an airport, something like that, rather than something that we reach back into history with after someone's upset that the Supreme Court ruled on something and then just declare it. How many of these things that they're talking about existed in 1791, at least in anything like the way they are now, museums, public libraries, public schools? None of this was around at the time, right? Were there even zoos? I think the earliest zoo was in the early 1800s, Judge, but we've always had schools. The school might look different than it looks like now. But to say that, well, it's a sensitive place simply because it's new. Well, the Supreme Court said that was a good example. They've not given us a whole lot to work with here. You know, there's all this picking and choosing of historical evidence. This is too early, this is too late, too small, too big. Whatever it is that slices and dices the historical evidence. But at the end of the day, the only examples the court gives us are things that are very hard to square with the kind of application. I mean, you know, the state says what Bruin was looking for was the historical record with respect to public carry, which certainly there were people carrying weapons in public in 1791, and that looks like a pretty good place to start. But now when you're talking about something that the court says has historical weight, which is that guns can be regulated in sensitive locations, and then it tells us that, well, you're looking for analogs. They don't tell us how, what, and what bases things are analogous. They give us some examples that don't seem to fit that slicing and dicing of the historical record. They tell us that if there's been dramatic technological or sociological change, and then they say the island of Manhattan, which I must say I'm sure looks a lot different to any, look extraordinary to someone from 1791, unlike, say, the Adirondack Park. I don't think we've got a lot to work with, so we're trying to ask you to tell us how we go about deciding, even if we take the narrowest view, how would we look at the question, what is analogous to courthouses, polling places, the state capitol that somehow also probably encompasses schools and government buildings of all descriptions, which may also encompass public schools. I don't know. So how are we supposed to do that? You tell us. How do you think we should do it? Well, we could look at what Judge Sinatra did in one of the other cases that was argued earlier, where he says that, you know, it's key functions of democracy. We could look at other, not schools, but something like a school that, you know, on a condition of entry into the building, your metal detector or otherwise, you have a security guard, a door guard. The only reason you have a metal detector is to keep out guns. I mean, you know, I'm just puzzled. Because you put up a medical detector, you can then keep guns out of there? Well, I'm answering the court's question about, like, what other type of building could be considered a sensitive place. And I'm not saying that just the fact that there's a metal detector there makes it sensitive. But if the court's looking for something that could be comparable, you know, we would go back to the Bruin how and why, and we would look at is the how and the why a comparable burden to now as it was understood back in 1791. And I want to, if I could, and I know I'm over time, so thank you. I think the Supreme Court has made it really explicitly clear. We have Espinoza v. Department of, Montana Department of Revenue, and Ramos v. Louisiana that points back to 1791. And Bruin itself points to 1791. And while it did leave the question kind of open, like, can we use 1868 at all, it says we can use 1868 law and further law to confirm that our understanding of what people understood in 1791 was accurate. And if I could, real quick, it's, you know, let me see. The Supreme Court said in Espinoza that they were using more than 30 states that created a statute in the late 19th century cannot by itself create an early American tradition. In that case, it was a school that people were paying money from the state to go to religious schools, Christian schools. And the state said, well, you can't do that. You can't use this money. And they said, well, in the late 19th century, we had all of these states. We had over 30 states that also thought the same thing. And the Supreme Court said 30 states isn't enough. So when my friends from the states say we have three ordinances, we have two territories, or we have, you know, three states, three states isn't enough. Bruin sets the floor. It has to be well established, and it has to be representative. And it has to be from, you know, the time period when the Second Amendment was ratified. Anything comes after that can only confirm what the understanding was during 1791. I'm not sure I understand that. I mean, 1791 is a point in time, and the founders were mainly young people, and they had full careers afterward. And their children were first generation after the founders. I'm not sure I see a problem with considering what the law was, what the understandings were as they were expressed, even 40 or 50 years after 1791 with the understanding that those laws and those arrangements would have still reflected the understandings of the people who lived at the time that the amendment was ratified. And Bruin discusses, you know, the various historical analysis, sometimes pulling census data, which they actually did both in the majority and in the dissent, to look at populations to see if those statutes were well established and representative of the population as a whole during that time frame. Now, I'm not saying you can't go three or five years behind, three or five years in front of 1791. But what I think Bruin says specifically is that it's not that Bruin doesn't endorse some freewheeling usage of any historical time period. You know, we're looking at a- I don't know what freewheeling means. I mean, I'm a lawyer, and you look to precedence and you look to laws, and I guess that's freewheeling. All I can say is what the court says, Judge, and Justice Barrett also cited it in her concurrence as well. Yeah, but she was specifically suggesting that we should be looking principally at 1868, right? And then she goes along with the majority opinion and says, well, but I'm on misunderstanding. I don't believe that her concurrence in Bruin was saying that we should rely on 1868. In fact, it looks to be opposite than that because she cited to Espinoza in her concurrence, which is the case that I read, talking about 30 statutes coming from the late 19th century isn't enough to create an early historical tradition. So I could have- But before, you can't go too far back either, though, right? I mean, it just puzzles me. The whole thing puzzles me. This is not the same thing, it seems to me, as interpreting a statute and saying, well, the Congress or the legislature had before it judicial decisions that said this, that, and the other thing. So we look at what was before them at the time, and we can say, well, they must have known about that, and they must have intended to incorporate it. But then if you're saying, well, we're not going to do that, we're not going to assume that they had this great understanding of all these English precedents. So it's not exactly like that. But I guess I have the same question as Judge Jacobs. Ultimately, why isn't the subsequent history relevant to what everybody thought the Second Amendment meant? We have to find something where at the time in 1791, if there wasn't legislation on the books somewhere that prohibited something, then we assume that everyone thought there was a constitutional right to do that something? Well, I mean, Judge, we have put together- the defendants in this case have put together a massive historical record and submitted it to the court. And the court, you know, I know that this court has questions on it, but the district court weighed and measured all of these different cases. It appears to be faithfully following Bruhn, depending on the timeliness of the statute, the population that was at issue. And that's why we go back to it's not an abuse of discretion to issue a preliminary injunction at this point. And granted, not all of the questions have been answered, but just because all the questions haven't been answered doesn't mean that the district court abused his discretion in coming up with the answer that he did. He didn't give us everything we asked for, and he didn't give the state everything they asked for. So it wasn't like it's just completely one-sided, Judge. And I know the court wanted to talk about good moral character. It's all briefed. If you had any questions, I'd be happy to answer them. Well, just actually one question I would ask on the licensing issue. As far as standing, your view is that it wasn't necessary, well, what is necessary to have standing to challenge the licensing? The licensing. So, you know, this court has the DeCastro precedent, which holds that there's a futility exception for actually having to go and apply for the permit itself. And if we take the case, it's a United States Supreme Court case, Simmons v. United States, where the Supreme Court has found it, quote, intolerable that one constitutional right should have to be surrendered in order to assert another. And that's what Mr. Sloan has done here. He's not going to give out his private social media accounts to the government. That's a violation of his First Amendment right. It's a violation to remain a violation of his First Amendment right. Why are his social media accounts private? I'm sorry, sir? Why are his social media accounts private? I thought they're social. They're all out there. Why can't the government just go and look for them? All he's doing is providing the convenience of giving a list. Well, to the extent that they're public and the government already knows about them, then fine. But a lot of people post anonymously. I'm on Twitter, not under my real name. But I don't want the government knowing who I am. It's none of their business, Judge. Maybe I want to troll them or something. I just keep it to myself. It shouldn't disqualify me from owning a gun. Mr. Sloan is a law-abiding citizen, but he doesn't need to sit down. But what's the value of any kind of background check? In effect, I take it you're not, at least you're not challenging any of the various categories of people who are categorically excluded as dangerous under the statute. Maybe other people will have problems with that, but you don't have a problem with that. So you check the box that says I've never been confined in a mental institution, and they just have to accept that? They can't do anything to look into whether that is true or not? I don't know about the social media accounts that are going to help that. But having to provide names of people who are close to you or have a limited number of names who might be able to be interviewed and say, yeah, he was locked up in a mental institution for five years. Why isn't that something that – I mean, are you saying they can't do anything? They can't follow up? The state has the ability, Your Honor, with all of those examples that you just gave, to be able to go into some of their databases and pull whatever information they want. Even in Mississippi, where my permit comes from, they run a background check, a NICS check from the federal government. It doesn't take three years, Judge. But there's a longer list of these categories, though. It's not just things that would be in that database. Now, again, I understand there's a little bit of a complexity here that we're not looking at all of these provisions, and some of them may be unconstitutional in themselves, I suppose, if someone were here who had standing and wanted to challenge them. But for our purposes, we're assuming that a lot of these other categories, they're in the law. Why isn't there some further ability to check into that? Now, again, there may be specific things that are too much or wouldn't be sufficiently helpful. I get all the arguments about that. But in terms of the basic question, can the government inquire about anything other than you tell us, are you one of these people? And you say no. Why can't they investigate some more? Well, the government is investigating, Your Honor. I mean, this isn't something where I go and apply and they just take my word for it and give me the permit that day. This is a one-year process just to apply. Mr. Sloan hasn't even been able to apply yet. But he hasn't applied yet because he objects to some of the requirements. So I don't know if you can say how long it's taken him because he's declining to participate. Well, I can say how long it's taking him, Judge, because his sheriff does not have an appointment available, or at least at the time that we filed this case, until October of 2023. So when we filed this case, it was over a year for him to even apply, knowing that an incomplete application would be denied because the sheriff admitted it. Isn't that more relevant to perhaps an as-applied challenge? Like the delay that you're talking about isn't something that is baked into the statute. Well, the statute says six months, Your Honor. But in practice, this is a New York thing because the statute obviously allows for that to happen. No permits get issued within six months. Wouldn't you agree that if the government has to dig through databases and do independent research in order to find out that which an applicant can put on the application form, that will only make it longer, make for longer waits before these permits can be granted? I'm sorry, Judge. You're saying it takes too long for these applications to be acted upon. And on the other hand, you say, why should applicants provide all this information when the government can spend its additional time digging through databases in order to find out what it wants to know and what the particular applicants say they don't want to provide? Well, my answer to your question earlier, Judge, was based on people that have publicly facing social media. A lot of people, I mean, I shouldn't say a lot because I don't really know. Some people, in this case, Mr. Sloan has an account that's private that's just set to his friends. He has a right to post anonymously. There's a lot of jurisprudence on anonymous speech. He doesn't have to friend the government. The government doesn't have to get into that. It is true that that's what they said in their briefs, Your Honor. But the statute completely says that a social media review shall be done. It's in the statute. It's not just that, oh, OK, here's the list. OK, somebody's got to go review that. Nassau County certainly thinks that they have the right to request passwords. There's the provision in the code that says the licensing officer can ask you any such information. Well, how hard would it be for the licensing officer? Let me just see your phone. And what are you going to do at that point? Maybe you've got some crimes committed that you've done and you don't want to disclose and invoke your Fifth Amendment. You think the licensing officer is going to give you a permit at that time? I can't imagine. I can't imagine. I appreciate it. Thank you. Thank you. Hello, Your Honors. I have four points, two just small ones about the scope of the injunction and two bigger ones about sensitive places. About the scope of the injunction, my colleague said that no one wants dangerous people to have guns. But that is exactly the relief that the plaintiffs have asked for and the district court ordered by precluding the government from using its good moral character requirement, which is designed to weed out dangerousness, and precluding the state from asking for information that would inform that inquiry. Next, my colleague said, Judge Lynch, no one wants to enter your house with a gun without asking you. Again, that is exactly the relief that the plaintiffs asked for and the district court ordered by enjoining the private property provision with respect to private residences. With respect to sensitive places, just a couple of big picture points. Judge Lynch, you asked, what are we to make of the use of new and analogous or Bruin's discussion of modern developments? And we think there are two things that this court can look to. New and analogous can mean that a place, even if it existed at the time of the founding, can become sensitive over time. The Supreme Court made clear that there are going to be cases that implicate unprecedented societal concerns, dramatic technological changes, and noted that the regulatory challenges posed by firearms today are going to be different from the historical time. This can come up in at least two different ways. One, firearms are obviously very different. The harms that can be imposed by today's firearms are very different. And that can be considered in deciding what principle of analogical reasoning you look to. The other point is that the way people go about their daily lives is fundamentally different today than it was in 1790. The population of New York City in 1790 was 33,000 people. An average attendance at a Yankees game in 2022 was 40,000 people. We're just talking about fundamentally different worlds that we live in. And what the court in Bruin made clear is that the Second Amendment does take some regulatory options off the table. But it does not tie the hands of legislatures or courts in responding to these modern developments by enacting reasonable laws that are relevantly similar to laws that existed earlier. And the last big picture point I'd like to make is about the use of evidence after 1791. This is especially important in the sensitive place context. As I mentioned earlier, the sources that Bruin itself cited in support of the sensitive places it recognized reference 19th century laws. If you look to schools, there actually are not found-in-error sensitive place regulations about schools. If that was the rule that your honors would adopt, it would render that portion of Bruin meaningless because Bruin will have recognized sensitive places that could actually not survive the test that plaintiffs say Bruin established. For all of those reasons, we urge that the court reverse the injunction. Thank you. Can I just ask one question that came up in the argument that I really haven't thought much about? Before Bruin, New York relied on the special needs licensing to deal with all of these problems. Almost all of the plaintiffs in these cases already have carry permits under New York law. So before Bruin, they could have gone into any of these places, at least absent some affirmative – I assume that Lincoln Center, at least the theater I go to most, wouldn't let me in with a gun because they do have metal detectors, so I guess that's what they would do. But subject to what they would do, someone like most of these plaintiffs could go to the zoo carrying a gun, and now they can't. Why does that not say something about how strong the justifications are for treating these places as so sensitive that even people who passed, now I realize these people may just be grandfathered in a way, and now there are going to be a whole bunch of people who, thanks to Bruin, will be able to get carry permits for the asking. But is that the difference, that now all these other folks get to run around with guns that makes these sensitive locations more sensitive than they were the day before Bruin? Well, Your Honor, as a legal answer to the question, the fact that certain places were not sensitive before does not mean that the Second Amendment precludes legislatures from designating them as sensitive now. That presumption is referencing what I discussed earlier. You can't presume that governments are always regulating at the maximum of their constitutional authority, so the mere fact that certain places were not sensitive before is really legally irrelevant. The fact that they weren't regulated before under the somewhat different conditions where we had our 100-year-old Sullivan Law that the Supreme Court discovered was unconstitutional, that doesn't mean that if they weren't regulated then they couldn't be regulated now because they've always been, or at least have been in recent history, sensitive places. It's just the state didn't feel the need to deal with it. Is that the answer? That's exactly right, Your Honor. Thank you very much. All right. Thank you. Thank you for all three. Next case, we'll take that case under advisement.